**In the Matter of the EXTRADITION OF Jaime MORALES.**

**CR No. 95–3056–M.**

United States District Court, S.D. California.

Oct. 26, 1995.

Alan D. Bersin, United States Attorney, Dennis J. Chow, Special Assistant U.S. Attorney, San Diego, CA, for U.S.

Gretchen C. von Helms, Federal Defenders of San Diego, Inc., San Diego, CA, for Jaime Morales.

## OPINION AND ORDER RE: BAIL

AARON, United States Magistrate Judge.

## I. PROCEDURAL HISTORY AND FACTUAL BACKGROUND

### A. *Proceedings Before Magistrate Judge Moskowitz*

On March 29, 1995, the United States Attorney for the Southern District of California filed a Formal Request for Extradition on behalf of the Republic of Mexico, seeking the extradition to Mexico of Jaime Morales, a United States citizen. The Complaint for Arrest with a View Towards Extradition, which was filed with the Request, stated that a warrant for Morales' arrest had been issued by the Sixth Judge for Criminal Matters of the Judicial District Court in the City

of Chihuahua, State of Chihuahua, Mexico, charging Morales with the criminal offense "breach of trust."[1] The complainant requested that a warrant for Morales' arrest be issued, and that he be brought before the United States District Court for the Southern District of California for an extradition hearing.

The Mexican court's summary of the evidence upon which the Court relied in issuing the arrest warrant for Morales was set forth in documents which accompanied the Formal Request for Extradition. This summary indicates that on May 7, 1991, at the offices of a company called "Tanques Y Construccionnes de Chihuahua, S.A. de C.V.," in Chihuahua, Chihuahua, Mexico, the alleged victim, Juan Manuel Puente Escarzaga[2], arranged to purchase from "Equipment Consultants, Inc.," through its legal representative, Jaime Morales, a used fifty ton Link–Belt crane, for the price of $60,000.00. Mr. Escarzaga later delivered the $60,000.00 to Hector D. Vela[3], an employee of the company selling the equipment, pursuant to Morales' instructions. Morales was to have the crane delivered to Escarzaga in El Paso, Texas, on May 23, 1991. When the delivery date came, Morales told Escarzaga that he had not yet received the crane. Escarzaga then went to Hector Vela to request that the crane be delivered, and was told by Vela that this would not be possible since, "... Jaime Morales had sold it to another person." Formal Request for Extradition at Annex 7.

On July 23, 1991, Escarzaga filed a criminal complaint against Equipment Consultants, Inc., and Morales. Documents filed with the Formal Request for Extradition indicate that the Mexican prosecutor originally sought a warrant for Morales' arrest for both breach of trust (or embezzlement) and for fraud. *Id.* However, based upon the factual allegations summarized above, the Mexican court concluded that the elements of the crime of embezzlement had been established, but that the elements of the crime of fraud

---

1. The literal translation of the offense charged is "breach of trust." The offense charged was translated in official documents as "embezzlement."

2. Also spelled as "Escarcega" in various documents submitted to the Court.

3. Also spelled as "Vella" in various documents submitted to the Court.

had not. The Mexican court reasoned that in the case of embezzlement,

> ... the perpetrator has in his possession the object as the object has been given to him to possess but once he has the object in his possession he disposes of it to his benefit; yet in the crime of FRAUD the perpetrator carries out schemes, machinations and deceit for the purpose of acquiring the thing for himself and thereby make an illicit profit. *From the proceedings it can be deduced that JAIME MORALES had in his possession the already mentioned crane, and which had been bought by JUAN MANUEL PUENTE ES-CARCEGA, and duly invoiced therefore he was the owner of the crane. However, JAIME MORALES disposed of same asset as he sold it to a third party.*

Formal Request for Extradition at Annex 7 (emphasis added).

On November 11, 1991, an arrest warrant was issued by the Mexican court charging Morales with the offense of embezzlement, only.

On March 30, 1995, Morales was arraigned by Magistrate Judge Barry Ted Moskowitz in the United States District Court for the Southern District of California in Case Number 95–0951–M, *In the Matter of the Extradition of Jaime Morales.* Morales was ordered held without bail. On April 6, 1995, a case management hearing was held before Magistrate Judge Moskowitz. At that hearing, counsel for Morales advised the Court that she intended to request that the Court set bail for Morales. Counsel acknowledged that, "... bail is extremely difficult to get in an extradition matter," but added that she planned to present to the Court evidence of "extraordinary circumstances" that would justify bail. [R.T. 4/6/95 at p. 5.][4] At the conclusion of the April 6 hearing, the Court set a motion hearing for May 18, 1995, and scheduled the extradition hearing for June 8, 1995. *Id.* at pp. 3–4.

At the hearing on May 18, 1995, Morales' counsel made an oral motion for bail, and proffered the existence of "special circum-stances" which she maintained justified the setting of bail. First, counsel argued that there was an inherent defect in the arrest warrant, since an essential element of the offense of breach of trust is that the accused *possessed* the personal property of another and disposed of that property, and Morales had never possessed the crane. [R.T. 5/18/95 at pp. 7–8.] Counsel further argued that because Morales had never had possession of the crane, the government would be unable to establish probable cause as to this element of the offense, and that there was thus a high probability that Morales would succeed on the merits at the extradition hearing. Counsel contended that these facts constituted "special circumstances" justifying bail. *Id.* at pp. 15–16. Morales' attorney also proffered that a similarly situated extraditee in Mexico would be entitled to bail under Mexican law, and argued that this, too, constituted a special circumstance justifying Morales' release on bail. *Id.* at pp. 14–15.

In response to these arguments, Magistrate Judge Moskowitz observed that if he were to find that Morales never in fact possessed the crane, then Morales could not be extradited, because there would not be probable cause to believe that he had committed the offense for which he had been charged. *Id.* at p. 8. With respect to ruling on this issue for purposes of determining Morales' eligibility for bail, Judge Moskowitz pointed out that the extradition hearing was to be held on June 8—only three weeks later—and that it would make more sense to simply move up the date of the extradition hearing rather than to hold protracted bail hearings on a dispositive issue. *Id.* at p. 9.

Magistrate Judge Moskowitz denied without prejudice Morales' oral motion for bail, indicating that a motion for bail in an extradition case should be in writing, thereby providing the government with notice as to what issues would be raised. *Id.* at p. 24. The date for the extradition hearing was not changed.

The first extradition hearing was held on June 30, 1995.[5] On that date, Morales' coun-

---

4. "R.T." refers to the Reporter's Transcript of Proceedings.

5. The record is unclear as to why the hearing did not go forward as scheduled on June 8, 1995.

sel sought to present evidence that Morales had never possessed the crane in question. Before this evidence was presented, counsel and the Court discussed the admissibility and the significance of such evidence. During this discussion, Magistrate Judge Moskowitz pointed out to government counsel that if in fact Morales had never had possession of the crane,

> ... we may have here probable cause of fraud, but for some reason the judge in Mexico refused to accept fraud as the charge, and while the Government prosecutor went for both fraud and breach of confidence or embezzlement, they only returned a breach of confidence or embezzlement charge. So the question is: Is there probably [sic] cause for the charge they actually returned? And if he never had possession, constructive or actual, I don't know how it could be a breach of confidence because even you contend that possession of some sort is required for that offense.

[R.T. 6/30/95 at p. 7.]

After hearing the testimony of the defense witnesses, Magistrate Judge Moskowitz pointed out that the defense evidence led to the conclusion that Morales may not have committed the crime of embezzlement at all, but rather, might have committed fraud. Judge Moskowitz again observed that, for some reason, the Mexican government had not asked that Morales be extradited for fraud, and inquired of government counsel, "[My] question is—then am I stuck?," to which the Assistant U.S. Attorney replied, "Yes, your honor." *Id.* at p. 101. Government counsel stipulated that the offense with which Morales had been charged, and for which extradition had been requested, required proof of the element of possession. *Id.* at p. 102.

The government was thus put on notice by Morales' counsel on May 18, 1995, that the defense intended to present evidence showing that Morales never had possession of the crane. Further, the government was on notice as of June 30, 1995, that the Court perceived a potentially fatal defect in the Formal Request for Extradition.

At the conclusion of the June 30 hearing, Morales' counsel again made an oral motion for bail, and indicated that she had submitted paperwork regarding proposed sureties to government counsel. *Id.* at pp. 123–24. The motion was not ruled upon on that date.

On July 7, 1995, another hearing was held at which the government presented two witnesses, Juan Manuel Puente Escarzaga, the alleged victim, and Hector Daniel Vela–Hernandez, the person to whom Escarzaga paid the $60,000.00. At the conclusion of this hearing, the Court indicated that it was concerned with two questions: 1) whether constructive possession of the crane would be sufficient under Mexican law to establish the offense charged; and 2) if so, whether there was probable cause to believe that Morales ever had constructive possession of the crane. [R.T. 7/7/95 at pp. 87–88.] At this hearing, Morales' counsel again requested that the Court consider setting bail. In response to the Court's inquiry, counsel indicated that she could offer no property at that time to secure a bond. Magistrate Judge Moskowitz stated that he was not willing to consider an unsecured bond. [R.T. 7/7/95 at p. 83.]

At a status hearing on July 18, 1995, Magistrate Judge Moskowitz again raised the issue of the error in the charging documents. Judge Moskowitz informed counsel that he had "very serious concerns," based upon the evidence presented by the defense, as to whether Morales ever possessed the crane. [R.T. 7/18/95 at p. 3.] He observed that if the Mexican government had had the evidence presented by the defense on the issue of possession at the time it made its charging decision, it may have charged Morales with fraud, not embezzlement. *Id.* at p. 5.

In spite of the fact that he had previously put the government on notice as to this flaw in the Request for Extradition, Judge Moskowitz concluded that it would be unfair to the government to render a decision as to Morales' extraditability at that time, "... when the Government hasn't had a chance to consider the effect of the evidence that the Defense has offered." *Id.* at pp. 6–7. Judge Moskowitz stated that he was going to give the government a continuance, and suggested

that the Assistant U.S. Attorney notify the Government of Mexico that if Judge Moskowitz were to consider the evidence offered by the defense, then he would not be able to find the element of actual possession. He further suggested that the Mexican government might want to amend its extradition request. *Id.* at p. 7.

Judge Moskowitz ordered briefing as to whether the Court could consider the evidence presented by the defense, and also as to the constructive possession issues he had raised earlier. He set a further hearing for August 31, 1995 and stated, "*I think that gives ample opportunity to the Government of Mexico to decide how they want to proceed.*" *Id.* at p. 8 (emphasis added).

Counsel for Morales objected to the Court allowing the government additional time to amend its extradition request. She pointed out that Morales was in jail and, that he had been incarcerated, at that time, for four months. *Id.* at pp. 8–9. She also argued that the government had known about the defense evidence for some time, but had not acted. Counsel then reiterated her request for bail, noting that at the May 18, 1995 hearing, when the Court decided not to render a decision as to whether or not Morales could establish the "special circumstances" that the warrant for his arrest was defective and that there was a high probability that he would succeed on the merits, the reason given by the Court was that the extradition hearing was to be held in three weeks. Counsel pointed out that since that time, the hearing had been continued a number of times for various reasons, and now quite a long time had passed, with Morales still in custody. *Id.* at p. 9. The Court did not rule on the bail request.

On August 25, 1995, another hearing was held. The Mexican government had not amended its Request for Extradition, despite the Court's previous comments. At this hearing, the Court heard argument from counsel as to whether or not Morales was extraditable. At the conclusion of the hearing, Magistrate Judge Moskowitz took the matter under submission. [R.T. 8/25/95 at p. 43.]

## B. *Proceedings before Magistrate Judge Cynthia G. Aaron*

On August 26, 1995, before rendering a decision on the extradition question, Magistrate Judge Moskowitz recused himself from the case. The case was then reassigned to Magistrate Judge Cynthia G. Aaron. On August 29, a status hearing was held before this Court. The Court set a date of September 29, 1995 for further proceedings, and indicated that it would make every effort to read all of the transcripts of the proceedings that had taken place before Judge Moskowitz and all of the pleadings that had been filed in the case by then and that it hoped to render a decision as to Morales' extraditability on that date.

On September 8, 1995, Morales filed a written motion for bail, which the Court heard and denied, without prejudice, at a hearing on September 22, 1995. The Court acknowledged that there had been significant delay to date in the proceedings, but commented that, at that time, the delay was not so unusual as to constitute a "special circumstance" justifying Morales' release on bail. [R.T. 9/22/95 at p. 14.] The Court indicated that, in its view, Morales' stronger argument was that there was a high probability that he would succeed on the merits, and that this was a "special circumstance" justifying bail in this case. *Id.* at p. 15. However, the Court denied the motion for bail because it had not yet determined whether or not it could consider the evidence presented by the defense in determining whether or not Morales was extraditable. *Id.* at p. 20. This Court indicated that it agreed with Magistrate Judge Moskowitz that if the defense evidence were to be considered by the Court, then the Court could not find probable cause for the offense charged, because the defense evidence established that Morales never had possession of the crane. *Id.* at pp. 15–16. This Court then inquired of government counsel whether or not the Mexican government intended to amend its extradition request. *Id.* at p. 17. The Assistant U.S. Attorney responded that such a request had been made earlier, that the Mexican judge was "reluctant," and that the process was still "unfolding." *Id.*

On September 29, this Court ruled that it could consider the evidence proffered by Morales pertaining to the element of possession of the crane in determining whether or not there was probable cause to believe that Morales had committed the crime charged, and that this evidence established that Morales had neither actual nor constructive possession of the crane at any relevant time. Finding that proof of the offense of embezzlement required proof that the accused had possessed of the item in question, this Court concluded that Morales was not properly extraditable for the offense of embezzlement and dismissed the complaint.

Immediately after the Court issued its oral ruling, the government presented a provisional arrest warrant for Morales for the offense of fraud, in Case Number 95–3056M, and asked that Morales be "taken into custody" pursuant to that warrant. [R.T. 9/29/95 at p. 15.] The warrant had been signed by another magistrate judge, unbeknownst to Magistrate Judge Aaron, on September 25, 1995—six months after Morales' arrest on the original arrest warrant.

Having anticipated Morales' release upon dismissal of the original complaint, counsel for Morales immediately requested that Morales be released on bail in the new case. *Id.* at p. 16. The Assistant U.S. Attorney took the position that the Court should continue to hold Morales without bail. The Court held a series of bail hearings on October 4, 10, 13, and 16, at which both counsel presented expert testimony regarding whether a potential extraditee in Morales' position would be entitled to bail in Mexico, whether bail would be available, in general, for the substantive offense with which Morales is charged, and what potential penalty Morales would be facing if convicted in Mexico. Morales' attorney also proferred two sureties willing to sign a bond for Morales. The question before the Court is whether the facts of this case present "special circumstances" entitling Morales to bail.

## II. *THE AVAILABILITY OF BAIL IN EXTRADITION CASES*

■ The United States Supreme Court has stated that bail should not ordinarily be granted in extradition cases. *Wright v. Henkel,* 190 U.S. 40, 63, 23 S.Ct. 781, 787, 47 L.Ed. 948 (1903). This presumption against bail exists "due to the foreign relations interest of the United States in successfully returning persons subject to criminal prosecution to the requesting country." *Matter of Extradition of Nacif–Borge,* 829 F.Supp. 1210, 1214 (D.Nev.1993). However, a court may grant bail in an extradition case when "special circumstances" exist justifying such relief. *Wright v. Henkel,* 190 U.S. at 63, 23 S.Ct. at 787; *Salerno v. United States,* 878 F.2d 317 (9th Cir.1989). "The standard for release on bail for persons involved in [foreign] extradition proceedings is a more demanding standard than that for ordinary accused criminals awaiting trial." *Nacif–Borge,* 829 F.Supp. at 1214, quoting *Hu Yau–Leung v. Soscia,* 649 F.2d 914, 920 (2d Cir.), *cert. denied,* 454 U.S. 971, 102 S.Ct. 519, 70 L.Ed.2d 389 (1981). The person facing the extradition hearing has the burden of establishing "special circumstances," *United States v. Taitz,* 130 F.R.D. 442, 444 (S.D.Cal. 1990). Once special circumstances are shown, the person must demonstrate to the court that he will not flee or pose a danger to any other person or to the community. *Nacif–Borge,* 829 F.Supp. at 1215.

■ Special circumstances need to be extraordinary and not factors applicable to all defendants facing extradition. *Nacif–Borge,* 829 F.Supp. at 1216, citing *Extradition of Smyth,* 976 F.2d 1535, 1535–36 (9th Cir. 1992). However, there need not be one overriding circumstance justifying an extraditee's release on bail. Rather, the cumulation of several factors can constitute special circumstances that justify bail in extradition proceedings. *Id.*

Courts have found various factors to constitute "special circumstances" justifying the setting of bail in extradition cases. In *United States v. Williams,* 611 F.2d 914, 915 (1st Cir.1979), the Court stated that special circumstances may include a delayed extradition hearing. In reaching this conclusion, the *Williams* Court cited *United States ex rel. McNamara v. Henkel,* 46 F.2d 84 (S.D.N.Y.1912), in which the Court stated, "[I]t is within the letter and spirit of most, if

not all, of our extradition treaties ... to arrest and hold *for a reasonable time* pending examination a person accused of crime abroad...." (emphasis added). In addition to actual delay, the projected length of extradition proceedings has been held to be a special circumstance. *Taitz,* 130 F.R.D. 442. In *Taitz,* the Court held that the prospect of lengthy hearings, which the Court anticipated would be needed in order to determine whether or not the accused was extraditable on over 400 counts of fraud, was a special circumstance.

The availability of bail for similarly situated extraditees in the requesting nation has also been held to constitute a special circumstance warranting bail. *Id.* at 446–47. The Court in *Taitz* analyzed whether bail would be granted in a comparable extradition case, dealing with an equivalent charge, in the requesting country. The Court noted that the usual rationale for denying bail in extradition cases, i.e., to avoid embarrassing foreign affairs consequences if the extraditee were to flee while on release, is not present where the requesting country would grant bail in a parallel situation. The Court considered this "lack of diplomatic necessity for denying bail" to constitute a "special circumstance." *Id.*

Courts have granted bail in extradition cases where bail would be available for the underlying substantive offense in the requesting country. *In re Gannon,* 27 F.2d 362 (E.D.Pa.1928); *Nacif–Borge,* 829 F.Supp. at 1220–21. In *Gannon,* the Court granted bail to a person facing extradition to Canada, finding that the availability of bail for the underlying substantive offense in Pennsylvania, where the person was arrested, and in Canada, the requesting country, justified setting bail. *Gannon,* 27 F.2d at 364. In *Nacif–Borge,* the Court reached the same conclusion after the extraditee "substantiated his position" by (1) providing a translation of the relevant criminal code under which he would receive bail in the foreign country, and (2) providing a favorable legal opinion from an experienced criminal law attorney in Mexico. *Nacif–Borge,* 829 F.Supp. at 1221. The Court held that the availability of bail on the underlying substantive offense in Mexico was

a "special circumstance" within the meaning of *Wright v. Henkel.*

The Court of Appeals for the Ninth Circuit has not precisely defined what constitutes "special circumstances." However, in *Salerno v. United States,* 878 F.2d 317, which involved an appeal of an extradition order, the Court gave three examples of factual scenarios that would establish special circumstances in that context: (1) where the accused, on appeal, raises substantial claims upon which he has a high probability of success; (2) where there has been a serious deterioration of the accused's health while incarcerated; and (3) where there has been unusual delay in the appeal process.

### III. *SPECIAL CIRCUMSTANCES IN THE PRESENT CASE*

#### A. *Unusual Delay to Date*

Morales was arrested in March of 1995. His extradition hearing was originally scheduled to take place before Magistrate Judge Moskowitz on June 8, 1995. However, for various reasons, the proceedings before Judge Moskowitz became protracted. Over a period of several months, the attorneys briefed a number of factual and legal issues, and the Court held several hearings at which counsel presented witnesses, other evidence, and argument, on these various issues. Magistrate Judge Moskowitz held his last hearing on August 25, 1995 and was to issue his final ruling on Morales' extraditability shortly thereafter, nearly three months after the extradition hearing was originally to have taken place. However, Judge Moskowitz recused himself from the case on August 26, 1995, before rendering his decision.

By the time this Court received the case from Magistrate Judge Moskowitz, Morales had already been in custody for five months. Judge Moskowitz originally anticipated that Morales' extradition hearing would be held in early June, and undoubtedly expected to render his decision on or shortly after that date. In that event, Morales would then have been in custody for less than two and one-half months.

After the case was reassigned to this Court, there was another, unavoidable delay because the Court needed time to read and

digest all of the transcripts and the papers that had been filed in the case, before it could issue a ruling. The case was assigned to this Court on August 29, 1995, and the Court issued its ruling on September 29, 1995. By that date, Morales had been in custody for six months, an unusually long time, given the facts of this case.

### B. *Projected Length of the Proceedings*

The most significant factor causing delay in this case is the government's filing of a new complaint seeking Morales' extradition for the offense of fraud. As early as May of 1995, government counsel was put on notice by Morales' attorney that there was evidence establishing that Morales never had possession of the crane. By June, 1995, government counsel was clearly put on notice by the Court that the Court believed that the charge of embezzlement contained in the first complaint and the Formal Request for Extradition might be fatally flawed, since possession of the embezzled item by the accused is an essential element of the offense, and it appeared that Morales never in fact possessed the crane. The Court reiterated this concern in mid-July.

The Court gave the government ample opportunity to obtain from Mexico an amended Request for Extradition. Had Mexico acted to amend its Request for Extradition when the flaw in the original charging documents was first brought to its attention, the extradition process in this case could have been shortened by several months. However, nothing was done for months. Instead, the government waited until September 29, 1995—the date on which the Court dismissed the embezzlement complaint—to file a new complaint charging Morales with fraud.

As the Court so aptly stated in *United States ex rel. McNamara v. Henkel*, 46 F.2d 84 (S.D.N.Y.1912),

> When the examination day comes and the complainant is not ready to proceed after having had a reasonable opportunity to communicate with the region from whence the request for extradition emanated, it is then time enough to ask for bail.

*Id.*

The extradition process must now start over again from the beginning. In fact, Mor-

ales finds himself further away from a resolution of the question of his extraditability than he was at the time of his arrest in March of 1995, since, at that time, a Formal Request for Extradition had been filed seeking his extradition for embezzlement, whereas now there is merely a provisional arrest warrant for the offense of fraud, and the government of Mexico has 60 days from the filing of the warrant to file a Formal Request for Extradition.

There are a number of factual and legal issues to be researched, briefed, heard, and resolved before this matter will be concluded. Counsel for Morales has indicated that she plans to challenge the government's showing of probable cause on the fraud offense, and also plans to attack the constitutionality of the extradition statute, 18 U.S.C. § 3184. See *Lobue v. Christopher*, 893 F.Supp. 65 (D.D.C.1995) All of this will undoubtedly take at least several more months to accomplish.

The government points out that in *United States v. Leitner*, 784 F.2d 159 (2d Cir.1986), the Court held that a six month delay in executing a provisional arrest warrant did not constitute a special circumstance justifying bail in an extradition case. *Id.* at 160. However, this argument is inapposite since the extraditee in *Leitner* was not in custody during those six months. Here, Morales has been held in custody without bail for seven months, and the Court cannot see an end to the proceedings in the near future.

■ The Court finds that the seven months which have already passed, together with the additional time the Court anticipates will be required before this matter is resolved, to be an undue delay and to constitute a special circumstance justifying Morales' release on bail.

### C. *Bail Considerations vis a vis the Republic of Mexico*

#### 1. *Availability of Bail for a Similarly Situated Extraditee in the Republic of Mexico*

Morales is a United States citizen whose extradition is sought by the Republic of Mex-

ico. In *Taitz*, 130 F.R.D. at 447, the Court granted bail to a South African citizen in the United States whose extradition was sought by South Africa. One of the reasons that the Court cited for granting bail was the fact that South Africa grants bail to persons facing extradition to the United States. The *Taitz* Court observed that the diplomatic necessity for denying bail did not exist in the case before it, since "... there [could] be no diplomatic concern by South Africa if a United States court releases on bail a person who is facing extradition to South Africa where bail is available in South Africa for persons facing extradition to the United States." *Id.*

■ Under the holding in *Taitz*, the relevant inquiry in the present case would be whether a Mexican citizen in custody in Mexico, whose extradition was sought by the United States, would be granted bail by the Mexican courts. The experts who were called as witnesses by both parties in this case testified that Mexico does not extradite its citizens to foreign countries for criminal prosecution. Rather, such persons would be tried in Mexico. [R.T. 10/4/95 at pp. 42-44 and 10/16/95 at pp. 31-32.] However, if the offense charged were one for which bail was allowed under Mexican law, then such persons *would* be entitled to bail, under the same terms and conditions as any defendant facing the same substantive charge. [R.T. 10/4/95 at pp. 44-45.] For the reasons set forth in the *Taitz* opinion, the Court finds this fact to constitute a special circumstance.

### 2. *Bail on the Substantive Offense*

Morales has produced evidence that under Mexican law, fraud is a bailable offense. [R.T. 10/4/95 at pp. 36-37.] Article 20 of the Mexican Constitution provides that bail must be granted in criminal prosecutions, except for "severe" crimes. [R.T. 10/16/95 at p. 7-8.] Court Exhibit 1, p. 3. Article 145(a) of the Criminal Code of Chihuahua indicates that fraud is a serious crime, but is not considered to be a "severe" crime unless there are 10 or more victims. *Id.* at pp. 11-13. See Court Exhibit 4, at p. 2-3. Bail would be available in Mexico to a person charged with the offense of fraud if the defendant could either pay restitution for the

amount of the fraud or could guarantee the amount of the fraud. *Id.* at pp. 32-33.

In *Nacif–Borge*, 829 F.Supp. 1210, the Court held that the fact that bail would be available in Mexico on the underlying substantive offense constituted a "special circumstance" justifying Nacif–Borge's release on bail. The Court pointed to the fact that Nacif–Borge had provided a translation of the pertinent criminal code under which he would receive bail if arrested in Mexico, and had also provided a legal opinion from an experienced attorney in Mexico favoring his position. *Id.* at 1221. Morales has done both of these things. Therefore, as in *Nacif–Borge*, Morales has established that the underlying substantive offense is one for which bail is available under Mexican law.

While this fact, alone, would not, in this Court's view, justify Morales' release on bail, in combination with the other factors mentioned above, it contributes to this Court's finding "special circumstances" justifying bail in this case. See *Nacif–Borge*, 829 F.Supp. at 1213.

In addition to the factors just addressed, at the Court's request, the parties have presented expert testimony regarding the potential penalty Morales faces in Mexico if convicted of the fraud offense with which he is now charged. The Criminal Code of Chihuahua provides that the punishment for fraud is between four and ten years of incarceration. [R.T. 10/16/95 at p. 29.] The government's expert witness testified that if convicted of the offense charged and sentenced anywhere within this range, Morales would have to serve a minimum of three years in custody before he would be eligible for release on parole. *Id.* at pp. 30-31. However, she also testified that Mexican law provides that if the defendant either pays restitution or guarantees the amount of damages, a sentence of from three days to six months—rather than four to ten years—would be imposed. *Id.* at pp. 32-33.

■ Morales has been in custody for seven months, which is more than the maximum sentence he would face *if* he were able to either pay restitution or to guarantee payment. While it appears from the record that

Morales is not presently able to do either, if at some time, before trial and conviction, Morales were to make restitution or guarantee payment of restitution, then he would already have served more than the maximum potential penalty for the offense with which he is charged. If this were to occur, it would certainly constitute a rather special circumstance justifying his release on bail.

## IV. *RISK OF FLIGHT AND DANGER*

 Once special circumstances are found, the Court must determine whether the person facing extradition poses a risk of flight or danger, before granting release on bail. *Nacif-Borge*, 829 F.Supp. at 1221; see also *Taitz*, 130 F.R.D. at 444–45. The record in this case shows that Morales is a United States citizen, born in San Diego in 1953. He has strong ties to San Diego. Morales and his wife lived in Texas from 1979 until 1981, when they relocated to San Diego. They have lived in San Diego since that time. They have two children, ages fifteen and nine, both of whom attend San Diego public schools. Morales has worked as a heavy equipment broker for seventeen years. Morales faces charges for the crime of fraud, an economic crime. There is no allegation that he poses a danger to any person or to the community. He has no prior criminal convictions, and there is no indication of a history of drug or alcohol abuse.

While Morales does have ties to Mexico in that both his and his wife's extended families live there, and he lived there from the time he was four years old until he moved to Texas in 1979, "he has demonstrated a sincere desire not to return there under these circumstances by vehemently contesting every phase of these extradition proceedings." *Nacif-Borge*, 829 F.Supp. at 1221.

Finally, Morales has presented numerous letters from friends and business associates attesting to his good character. He has also offered two proposed sureties who are financially responsible, and who are willing to post their own property to secure a bond for him.

Based on these factors, the Court finds that Morales poses no risk of flight or danger.

## V. *CONCLUSION*

While there is a presumption against bail in foreign extradition cases, a court may grant bail where special circumstances exist and where the person facing extradition poses no risk of flight or danger. The Court finds that there are special circumstances justifying Morales' release on bail, and that he poses no risk of flight or danger. The Court will therefore grant bail in this case on the following terms and conditions:

Morales shall post a personal surety bond in the amount of $150,000, secured by property belonging to his friends, and co-signed by the property owners, as well as by Morales' wife. Both the government and the Court must be satisfied that the bond is in fact secured by collateral before a release order will be signed.